Argued and submitted February 25; resubmitted En Banc November 19, reversed and remanded December 23, 1998, appellant's petition for reconsideration filed January 6 and respondent's petition for reconsideration filed January 7 and appellant's response to respondent's petition for reconsideration filed January 13 allowed by opinion February 17, 1999

See 158 Or App 485, _____ P2d _____ (1999)

Professor Eric M. HOLMES,
*Appellant,*

*v.*

WILLAMETTE UNIVERSITY,
*Respondent.*

(9507-05266; CA A95864)

971 P2d 914

James T. McDermott argued the cause for appellant. With him on the briefs were Steven C. Berman and Ball Janik LLP.

Paul C. Buchanan argued the cause for respondent. With him on the brief were Susan M. Hammer, Charles F. Adams, and Stoel Rives LLP.

HASELTON, J.

Deits, C. J., concurring in part; dissenting in part.

## HASELTON, J.

Plaintiff appeals from a summary judgment dismissing his claims of unlawful employment discrimination, ORS 659.425, and breach of contract against his former employer, defendant Willamette University. We conclude that the trial court correctly dismissed plaintiff's breach of contract claim but erred in dismissing his claim that defendant failed to reasonably accommodate his alcoholism. Accordingly, we reverse and remand.

Viewed most favorably to plaintiff, the nonmovant,[1] the record discloses the following material facts:

In 1989, defendant hired plaintiff to teach at its law school. When defendant hired plaintiff, it knew that he was a chronic alcoholic. Between January 1989 and January 1993, plaintiff did not drink in any way that affected his job performance.

Between January and March 1993, plaintiff suffered relapses, resulting in binge drinking. As a result of those binges, plaintiff missed two classes, which he later made up, and an important faculty meeting. Even with those absences, plaintiff's attendance was one of the best, if not the best, on the Willamette Law School faulty.

After a relapse in March 1993, law school administrators, in conjunction with plaintiff's counselor, participated in an "intervention." As a result of that intervention, in April 1993, plaintiff was presented with, and signed, a "last chance agreement." The agreement provided, *inter alia*, that plaintiff would completely abstain from using alcohol and controlled substances, would undertake a course of treatment, including participating at his own expense in in-patient treatment at Springbrook Northwest, a facility in Newberg, beginning in June 1993, and would cooperate in ongoing monitoring. The agreement also provided that "any breach" of the agreement would be deemed "to be professional irresponsibility and shall cause immediate initiation of Termination or Dismissal proceedings," pursuant to defendant's

---

[1] *See, e.g., Tolbert v. First National Bank,* 312 Or 485, 494, 823 P2d 965 (1991).

personnel policies and procedures. The applicable provisions of defendant's personnel rules are those in Policy X.G ("Policy G"), relating to termination after tenure. Policy G sets forth grounds for termination, including disability, along with certain procedural rights that the affected faculty member may invoke. Plaintiff remained sober and performed his duties without incident until the end of the school year.

In early June, after the end of the school year, Holmes entered in-patient treatment at Springbrook pursuant to the "last chance" agreement. After receiving 30 days' treatment, but before completing the in-patient program, plaintiff, with his physician's consent, left Springbrook to be with his 12-year-old son during a period of great distress in plaintiff's marriage. Plaintiff agreed to return to Springbrook on July 19.

Plaintiff did not return to Springbrook on July 19 because his wife had left him and he had no one to take care of his son. Plaintiff contacted his Willamette monitor under the "last chance" agreement about his inability to return to Springbrook and understood that the monitor would contact Springbrook. A few days later, some time between July 20 and July 25, plaintiff suffered another relapse. When Willamette administrators learned that plaintiff was not at Springbrook and that he had suffered a relapse, they informed plaintiff that he was in violation of the "last chance" agreement and insisted that he return to Springbrook or be terminated from his employment.

On July 27, plaintiff returned to Springbrook, where he was reevaluated by staff. Springbrook declined to readmit plaintiff, concluding, in part, that continued treatment would be unsuccessful because, given plaintiff's family-related problems, "he could not stay focused if he was still in the area." Plaintiff's treating physician, Dr. Byrd, testified that he and the other members of the Springbrook staff "felt [plaintiff] was still treatable, but that he needed to be transferred to the 'COPAC' facility in Jackson, Mississippi." That is, that plaintiff needed to be "in a different environment."

On July 29, plaintiff met with Dr. Byrd and two law school deans. Byrd explained his recommendation for continued treatment at COPAC. The deans then told plaintiff that

he was being terminated from his employment and that termination was in his best interest so that he could pursue treatment at COPAC. Plaintiff then asked for a one-year *unpaid* leave of absence from the law school so that he could retain his position while pursuing his treatment at the COPAC facility. The deans rejected that request, repeating that plaintiff was "officially terminated now."

On August 2, 1993, plaintiff submitted his written resignation to defendant's president. By letter of the same date, the president accepted the resignation, effective at the end of the 1993-94 academic year, with plaintiff's salary to continue through that time. In the president's letter, plaintiff was asked to "vacate [his] office before school begins this fall" and to sign at the bottom of the letter to "affirm" his acceptance of "this agreement." He never signed as directed. Nevertheless, defendant paid plaintiff his salary through the time specified in the president's letter.

Other Willamette professors covered Holmes's projected class-load for the ensuing 1993-94 academic year. Willamette presented no evidence of any additional costs or "hardship" that it incurred, or would have incurred, if it had acquiesced in Holmes's request for a leave of absence.[2]

In 1995, plaintiff brought this action, alleging that (1) defendant had violated ORS 659.425 by failing to reasonably accommodate his alcoholism; and (2) defendant had breached its employment contract with plaintiff. The trial court, in various proceedings, allowed dispositive motions for summary judgment against both of those claims. In particular, the trial court concluded that, as a matter of law, defendant had reasonably accommodated plaintiff's alcoholism and that plaintiff's letter of resignation precluded his breach

[2] At oral argument on appeal, Willamette argued, for the first time, that it would have been futile to grant Holmes a one-year unpaid leave of absence to undergo treatment at COPAC, because, without drawing pay, he would have been unable to fund his treatment. Holmes responded, also for the first time at oral argument, that that simply was not true—that because of a COBRA-based continuing entitlement to health benefits, he could have gone to COPAC, even if he wasn't drawing salary as a faculty member. Willamette's "unpaid leave would have been futile" contention is not properly before us. That argument, which is necessarily factual, was not raised below and is utterly unsupported on the evidentiary record.

of contract claim. On appeal, plaintiff challenges both of those dispositions, and we consider each in turn.

■     Plaintiff's employment discrimination claim is based on ORS 659.425(1)(a), which provides that it is an unlawful employment practice for an employer to discharge an employee on the basis of "a physical or mental impairment which, with reasonable accommodation by the employer, does not prevent the performance of the work involved." Before addressing the particulars of plaintiff's "reasonable accommodation" analysis, we must consider defendant's threshold argument that ORS 659.475(1) does not apply because plaintiff resigned from his employment and, thus, was not "discharged" within the meaning of the statute. Plaintiff responds that, on this record, there are, at least, disputed issues of material fact as to whether he was effectively confronted with a "resign or be discharged" situation and, thus, was "constructively discharged" for purposes of his statutory claim. *Sheets v. Knight*, 308 Or 220, 226-27, 779 P2d 1000 (1989). We agree with plaintiff that the record is reasonably, albeit not necessarily, susceptible to a reading that plaintiff was constructively discharged before he tendered his resignation.[3] Accordingly, summary judgment cannot be affirmed on that ground.

With that matter resolved, the dispositive issue, for purposes for plaintiff's statutory claim under ORS 659.425(1)(a), is whether, applying the criteria of OAR 839-06-245(2) (1991), plaintiff's request for a one-year leave of absence to participate in out-of-state medical treatment of his alcoholism was a "reasonable accommodation." Even

---

[3] However, we do not agree with plaintiff's argument that his August 2, 1993, resignation was not accepted by defendant or that there is a question of fact as to whether "additional terms" in the president's letter constituted a counteroffer. Defendant simply agreed to pay plaintiff for one year beyond the cessation of his services and asked him to vacate his office. Arguably, the additional year's salary was required by defendant's personnel Policy G, or was at least consistent with it. In any event, it was not an "additional term" as a matter of law. If it was not required by Policy G, it was a gratuity on defendant's part, for which no consideration from plaintiff was offered or demanded. Similarly, defendant's insistence that plaintiff vacate his office was not an "additional term." It was integral to plaintiff's resignation and defendant's acceptance of the resignation.

We also emphasize here, and will explain at greater length below, that plaintiff's constructive discharge theory *could* benefit him only in connection with his statutory claim. 157 Or App at 715. It cannot bolster his contractual claim.

more narrowly, because this is an appeal from a summary judgment for defendant, the issue is whether, on this record, any reasonable juror could resolve that issue in plaintiff's favor.[4]

■    ORS 659.425(1)(a) (1993)[5] read as follows:

"For the purpose of ORS 659.400 to 659.460, it is an unlawful employment practice for any employer to refuse to hire, employ or promote, to bar or discharge from employment or to discriminate in compensation or in terms, conditions or privileges of employment because:

"(a) An individual has a physical or mental impairment which, *with reasonable accommodation by the employer*, does not prevent the performance of the work involved." (Emphasis added.)

Active alcoholism is a "physical or mental impairment" within the meaning of ORS 659.425(1)(a) (1993). *Braun v.*

---

[4] No Oregon decision appears to have addressed whether "reasonable accommodation" is a question of fact or of law—that is, whether the question of "reasonableness" is innately a jury question or whether, if, the underlying material "historical" facts are uncontroverted, the determination of "reasonableness" is for the court. Here, however, the parties, citing federal case law construing the "reasonable accommodation" provisions of the federal Rehabilitation Act of 1973, 29 USC § 791, and the American with Disabilities Act, 42 USC § 12101 *et seq.*, agree that "reasonableness" is ordinarily a question of fact for the jury. *See, e.g., Fuller v. Frank*, 916 F2d 558, 562 n 6 (9th Cir 1990) (under Rehabilitation Act, "[w]hether the agency has provided 'reasonable accommodation' is ordinarily a question of fact," and the employer bears the burden of proving inability to accommodate. Where, however, no reasonable jury could return a verdict for the plaintiff, factual dispute is not "genuine" and summary judgment is appropriate.); *Schmidt v. Safeway Inc.*, 864 F Supp 991, 997 (D Or 1994) ("Ordinarily, the reasonableness of an accommodation is an issue for the jury."). Given the way in which the parties have framed the issue, we accept that formulation.

[5] The former version of ORS 659.425(1)(a) was in effect at all material times. That statute and its implementing regulations have since been significantly amended. In particular, ORS 659.425(1) was significantly changed in 1997. Or Laws 1997, ch 854, § 13. Also in 1997, Oregon adopted new provisions relating to disability discrimination in employment under ORS 695.436 through ORS 659.449. Or Laws 1997, ch 854, §§ 2-11. Those provisions specifically provide that they "shall be construed to the extent possible in a manner that is consistent with any similar provisions of the federal Americans with Disabilities Act of 1990, as amended." Or Laws 1997, ch 854, § 11.

The version of ORS 659.425(1) that applies in this case was enacted before the enactment of the Americans with Disabilities Act and was modeled after the Rehabilitation Act of 1973, sections 503 and 504. *See OSCI v. Bureau of Labor and Industries*, 98 Or App 548, 553 n 6, 780 P2d 743 (1989).

*American International Health,* 315 Or 460, 467-69, 846 P2d 1151 (1993).

OAR 839-06-245 (1991) defined an employer's duty to reasonably accommodate an employee's physical or mental impairment:

"ORS 659.425 imposes an affirmative duty upon an employer to make reasonable accommodation for an individual's physical or mental impairment where the accommodation will enable that individual to perform the work involved in the position occupied or sought:

"(1) Accommodation is a modification or change in one or more of the aspects or characteristics of a position including but not limited to:

"(a)   Location and physical surroundings;

"(b)   Job duties;

"(c)   Equipment used;

"(d)   Hours, including but not limited to:

"(A) Continuity (extended breaks, split shifts, medically essential rest periods, treatment periods, etc.); and

"(B)   Total time required (part-time, job-sharing).

"(e) Method or procedure by which the work is performed.

"(2) Accommodation is required where it does not impose an undue hardship on the employer. Whether an accommodation is reasonable will be determined by one or more of the following factors:

"(a)   the nature of the employer, including:

"(A) The total number in and the composition of the work force; and

"(B) The type of business or enterprise and the number and type of facilities.

"(b) The cost to the employer of potential accommodation and whether there is a resource available to the employer which would limit or reduce the cost. Example: funding through a public or private agency assisting handicapped persons;

"(c)   The effect or impact of the potential accommodation on:

"(A)   Production;

"(B)   The duties and/or responsibilities of other employees; and

"(C)   Safety:

"(i)   Of the individual in performing the duties of the position without present risk of probable incapacity to him/herself; and

"(ii)   Of co-workers and the general public if the individual's performance, with accommodation, does not present a materially enhanced risk to co-workers or the general public (See OAR 839-06-230).

"(d)   Medical approval of the accommodation; and

"(e)   Requirements of a valid collective bargaining agreement including but not limited to those governing and defining job or craft descriptions, seniority, and job bidding, but this rule shall not be interpreted to permit the loss of an individual's statutory right through collective bargaining.

"(3)   A handicapped person who is an employee or candidate for employment must cooperate with an employer in the employer's efforts to reasonably accommodate the person's impairment. A handicapped person may propose specific accommodations to the employer, but an employer is not required to accept any proposal which poses an undue hardship. Nor is the employer required to offer the accommodation most desirable to the handicapped person, except that the employer's choice between two or more possible methods of reasonable accommodation cannot be intended to discourage or to attempt to discourage a handicapped person from seeking or continuing employment."

*See Braun,* 315 Or at 472 (The legislative history of ORS 659.425(1)(a) "reveals that the legislature chose to leave development of the concept of 'reasonable accommodation' to the Bureau of Labor and Industries in its administrative rules.").

■   On this record, and applying the criteria of OAR 839-06-245(2) (1991), a jury could reasonably determine that

plaintiff's request for an unpaid leave of absence, for a specified period, to address his alcoholism constituted a "reasonable accommodation." In particular, a jury could find that plaintiff's request was reasonable in that: (1) Plaintiff had never taken a leave of absence during the academic year for treatment purposes. (2) Plaintiff participated in treatment at Springbrook at defendant's express direction pursuant to the "last chance agreement." (3) Springbrook medical staff—the same staff to whom defendant had referred plaintiff—recommended and endorsed his participation in the COPAC program which, necessarily, required a leave of absence. (4) Specifically, plaintiff's physician at Springbrook testified that plaintiff's participation in the COPAC program would not be futile—that plaintiff was "treatable" at COPAC. (5) Defendant demonstrated no hardship—additional expense or significant disruption of the law school's operations—that would have resulted from acquiescing in plaintiff's request. Given those facts, there is, at least, a genuine issue of material fact as to "reasonable accommodation."

*Schmidt v. Safeway Inc.*, 864 F Supp 991 (D Or 1994), is illustrative. There, the plaintiff, who had worked as a truck driver for Safeway, asserted that Safeway's refusal to grant his request for unpaid leave to obtain treatment for his alcoholism constituted a failure to provide a reasonable accommodation under both the Americans with Disabilities Act and ORS 659.425. The *plaintiff* moved for summary judgment on the "reasonable accommodation" issue and on the defendant's "undue hardship" defense, and the court granted that motion:

> "[A] leave of absence to obtain medical treatment is a reasonable accommodation if it is likely that, following treatment, plaintiff would have been able to safely perform his duties as a truck driver. An employer is not required to offer an accommodation that is likely to be futile because, even with the accommodation, the employee could not safely and efficiently perform the essential functions of the job. Thus an employer would not be required to provide repeated leaves of absence (or perhaps even a single leave of absence) for an alcoholic employee with a poor prognosis for recovery. * * *

"Ordinarily, the reasonableness of an accommodation is an issue for the jury. In this case, defendant's own Medical Review Officer ('MRO') advised defendant that plaintiff 'should be an excellent employee after he finishes treatment' and recommended 'he be considered on medical leave until he completes treatment and then he can certainly return to his regular job.' * * * Thus there is no factual dispute for the jury to resolve, and plaintiff is entitled to partial summary judgment on this issue as a matter of law. The employer may still have other defenses in a specific case. I will consider those separately.

"* * * * *

"Defendant argues it was not required to provide a leave of absence to plaintiff because that would have imposed an undue hardship on the company. Undue hardship is an affirmative defense to a failure to provide reasonable accommodation under both the ADA and its Oregon counterpart. 42 U.S.C. § 12112(b)(5)(A); OAR 839-06-245. However, defendant offers no evidence of any economic impact upon the company or disruption of its operations. Rather, defendant argues that granting a leave of absence to plaintiff in lieu of termination would undermine its substance abuse deterrence program. That is not the sort of hardship the statute envisions. * * *" 864 F Supp at 996-97.

Thus, the court in *Schmidt*, granted *plaintiff* summary judgment on evidence that, at least in part, approximates the evidence presented here. Here, as in *Schmidt*, the physicians to whom the employer referred the employee (in *Schmidt*, the Medical Review Officer; here, Dr. Byrd at Springbrook) recommended the unpaid leave of absence for treatment. Here, as in *Schmidt*, "defendant offers no evidence of any economic impact upon * * * or disruption of its operations." 864 F Supp at 997.

We thus conclude that, applying the controlling criteria of OAR 839-06-245 (1991), plaintiff's "reasonable accommodation" claim raises triable issues of material fact.

The dissent, in reaching the contrary conclusion, relies exclusively on *Braun* and, particularly, on *Braun*'s general observation that ORS 659.425(1)(a) imposes a less rigorous burden of "reasonable accommodation" than that imposed on the federal government, as an employer, under

section 501 of the Federal Rehabilitation Act. *See* 157 Or App at 717. Although the dissent asserts that "the analogy [to *Braun*] is strong," *id.* at 716 n 1, the context in which *Braun* offered that *dictum* was materially different. *Braun*'s observations in that regard were made solely in context of addressing a narrow certified question: Whether under Oregon law, as under the Federal Rehabilitation Act, it is "an unlawful employment practice * * * to discharge from employment an alcoholic employee whose present use of alcohol prevents her from performing the duties of her job, if that employee denies having any problem with alcohol?" 315 Or at 462. That question is inapposite here: Plaintiff freely acknowledged his alcoholism and was seeking treatment for that condition.

Most significantly, after noting that the Oregon legislature "did not intend to impose on Oregon employers the same high standards that the federal government imposes on itself, including the requirement that an employer accommodate an employee based on mere suspicion of an impairment," *Braun* went on to say:

> "Legislative history reveals that *the legislature chose to leave development of the concept of 'reasonable accommodation' to the Bureau of Labor and Industries in its administrative rules*. Minutes, House Committee on Labor, June 18, 1979, p 1." 315 Or at 472 (emphasis added).

Those "administrative rules" are the "reasonable accommodation" criteria of OAR 839-06-245(2) (1991). The dissent makes only one passing reference to those criteria and does not explain why, under those criteria, no reasonable juror could conclude that plaintiff's request for unpaid leave was a "reasonable accommodation."

*Braun*, at most, offers *dictum* in a materially different context. Conversely, OAR 839-06-245(2) (1991) expressly prescribed the factors that *must* be applied in *every* "reasonable accommodation" case under ORS 659.425(1). *See* OAR 839-06-245(2) (1991) ("whether an accommodation is reasonable *will* be determined by one or more of the following factors * * *") (emphasis added). Because, on this record, the application of those controlling criteria raises triable issues of material facts, the court erred in entering summary judgment against plaintiff's reasonable accommodation claim.

Turning to plaintiff's breach of contract claim, that claim is necessarily dependent on the premise that defendant discharged him. In contrast to the analysis with respect to the statutory discrimination claim, however, *see* 157 Or App at 708 n 3, plaintiff's constructive discharge theory does not assist him with respect to the breach of contract. Indeed, plaintiff's resignation is decisive in defendant's favor.

■  *Sheets* and the later Oregon appellate decisions, where the constructive discharge doctrine was formulated and applied, have generally or invariably dealt with common law or statutory wrongful discharge claims. We do not foreclose the possibility that—nor do we decide whether—the doctrine might *ever* be applicable to a claim in which the gravamen is the breach of an employment contract. However, the doctrine cannot apply under the evidence in this case which, when viewed most favorably to plaintiff, demonstrates that the alternative to resigning that defendant gave plaintiff was that the applicable termination provisions of the contract, *viz.* Policy G, would be invoked. Unlike the ORS 659.425 claim, where the resignation in lieu of termination *could arguably* have coincided with a violation of the statute, the contractual termination provisions could not have been breached by the threat that they would be pursued according to their terms unless plaintiff resigned. In the absence of any basis for concluding that the termination provisions of the contract *could not* have been properly applied to plaintiff under the facts, he cannot demonstrate a breach of the contract by virtue of the fact that his agreement to resign made it unnecessary and impossible for defendant to apply the provisions.[6]

---

[6] Our reasoning in this connection is somewhat analogous to the Supreme Court's conclusion on another issue in *Sheets*. The court held there that, although a wrongful discharge claim can sometimes arise out of the termination of an at-will employment, such a termination cannot be actionable as a breach of the implied covenant of good faith and fair dealing because no implied duty can arise to desist from performing in a manner that the terms of the contract expressly allow. Similarly, the "resign or be fired" rationale may be a basis for a finding of constructive discharge, but it cannot *in itself* establish a breach of an employment contract where the employer has a right to pursue termination procedures *and* where the call for the employee's resignation is not in itself contrary to the contractual termination procedures.

We have considered the parties' remaining arguments and do not consider further discussion to be warranted. The trial court correctly dismissed the breach of contract claim but erred in dismissing plaintiff's statutory discrimination claim.

Reversed and remanded.

**DEITS, C. J.,** concurring in part and dissenting in part.

I concur in the majority's disposition of the contract claim. However, I do not agree with the majority that a reasonable juror could find in plaintiff's favor on the "reasonable accommodation" issue. I therefore dissent from the majority's disposition of the statutory claim, and I would affirm the judgment of the trial court in its entirety.

In *Braun v. American International Health*, 315 Or 460, 846 P2d 1151 (1993), the Supreme Court discussed a number of issues concerning an employer's duties in connection with alcoholic employees under ORS 659.425[1] and under the Federal Rehabilitation Act of 1973. After discussing arguments by the plaintiff that the state statutory requirement of "reasonable accommodation" should be interpreted consistently with certain authorities construing or applying the federal act, the Oregon court stated:

> "The difficulty with the authorities on which plaintiff relies is that the standards that the federal government requires itself to meet as an employer of the disabled under section 501 [of the federal statute] are much higher than the standards that the government requires state and local governments and private employers to meet under sections 503 and 504. Section 501 was 'intended to make the federal government a model employer of the handicapped.' *Crewe v. U.S. Office of Personnel Management*, * * * 834 F2d [140,] 142, [8th Cir 1987]; *see also* 29 CFR § 1613.703 (1992) ('The Federal government shall become a model employer of handicapped individuals.'). With regard to alcoholism in

---

[1] I note at the outset that the issues in *Braun* and here are not identical. I rely on the court's statements in *Braun* by way of analogy. However, the analogy is strong, and *Braun* is the only case of either Oregon appellate court that has discussed the application of ORS 659.425 in connection with an alcoholic employee.

particular, the extensive scope of the government's self-imposed duty of reasonable accommodation * * * arises not only from section 501, but also from other federal law and internal publications that apply only to the federal government." *Id.* at 471.

The court then proceeded, in a footnote quoting from *Fuller v. Frank,* 916 F2d 558, 562 (9th Cir 1990), to describe

"[t]he 'reasonable accommodation' that a *federal* employer *must* make for an alcoholic employee * * *:

" ' "[R]easonable accommodation" requires that a governmental employer follow a progression of increasingly severe responses to an employee's alcoholism. The employer should (1) inform the employee of available counseling services; (2) provide the employee with a "firm choice" between treatment and discipline; (3) afford an opportunity for outpatient treatment, with discipline for continued drinking or failures to participate; (4) afford an opportunity for inpatient treatment, if outpatient treatment fails; and (5) absent special circumstances, discharge the employee for further relapse.' " *Braun,* 315 Or at 471 n 15 (emphasis in original).

Finally, the court observed in *Braun* that, in general contrast to section 501 of the federal statute:

"There is no equivalent showing that the Oregon legislature intended to impose such high standards on private employers under ORS 659.425(1)(a). On the contrary, legislative history suggests that the legislature chose to impose a lesser burden on employers under ORS 659.425(1)(a) * * *." *Id.* at 471-72.

It is apparent from the above discussion that, at the least, the "reasonable accommodation" standard that defendant, a private employer, must meet under the state statute is no *higher* than the standard for federal employers that the courts described in *Braun* and *Fuller.* I would nevertheless hold that, even if we apply the standard set forth in *Braun* and *Fuller,* defendant did reasonably accommodate plaintiff's alcoholism. Plaintiff sought counseling at defendant's suggestion; he was given the "firm choice"—and the opportunity to implement it—between treatment and discipline; he then underwent inpatient treatment at defendant's insistence; and he suffered a further relapse.

After having undertaken the above actions, defendant had done all that the reasonable accommodation provision of the state statute required of it. Even if the prospects were high that additional inpatient treatment would meet with success, notwithstanding that plaintiff's active alcoholism had persisted unabated through his first inpatient stay, that does not change the fact that the statutory requirement had been met. The prospects for plaintiff's future improvement ceased to be legally relevant beyond that point. Moreover, if the factual inquiry on which the majority focuses *were* of any continuing relevance, the majority's portrayal of the positive expectations from a second hospitalization that were entertained in the summer of 1993 is decidedly lopsided, even under a standard of review in which all facts are to be viewed as favorably as possible to plaintiff. It would be more accurate to say that the treating personnel at Springbrook were of the view that plaintiff had gained no ground there, that they could do nothing more for him, and that treatment at the out-of-state COPAC facility was a last-ditch hope.[2]

Even the federal authority on which the majority relies recognizes that "an employer would not be required to provide repeated leaves of absence (or perhaps even a single leave of absence) for an alcoholic employee with a poor prognosis for recovery." *Schmidt v. Safeway Inc.*, 864 F Supp 991, 996 (D Or 1994). Indeed, the majority's emphasis on the fact that plaintiff had never taken a leave of absence to undergo inpatient therapy seems to me to miss the mark. The fact is that—whether on defendant's time or his own—plaintiff *had* undergone inpatient treatment before his purported discharge, and it had been unsuccessful. Nothing that defendant's personnel could have known, in the aftermath of the inpatient treatment that plaintiff underwent as required by

---

[2] I by no means imply that the situation was *in fact* hopeless; indeed, there is evidence in the record that plaintiff had gone without alcohol for a significant period as of the time when that evidence was taken. However, the inquiry is necessarily one of expectations at the times that actions were taken, rather than one about ultimate events. The nature of alcoholism is such that *ultimate* outcomes are essentially unknowable. Periods of recovery and relapse are often incidents of the condition. *See, e. g., Steele v. Employment Department*, 143 Or App 105, 108-09, 923 P2d 1252, *rev allowed* 324 Or 487 (1996), and cases there cited. However, wherever the point may be, a "reasonable accommodation" of the disease must *necessarily* have an ending point in time, while the progress of the disease and of recovery do not.

the parties' "last chance agreement," could have given them reason to think that a leave of absence for further hospitalization would have been anything more than a long-odds gamble on top of the one they had already lost.

It is important to emphasize that the question here is not whether plaintiff was in any way blameworthy. *Compare Steele v. Employment Department*, 143 Or App 105, 923 P2d 1252, *rev allowed* 324 Or 487 (1996) (relating to whether and when discharges resulting from alcoholism are for work-related misconduct under the unemployment compensation statutes). The question is also not whether defendant's response to the situation was "estimable," in some subjective sense that the majority or I might find desirable. The question is whether the law required defendant, a private employer, to do more than it did to accommodate plaintiff's alcoholism before constructively discharging him.[3]

I acknowledge that the language in *Braun*, which it quotes from *Fuller* and on which I rely, is *dictum*. It is nevertheless *dictum* from the state's highest court on a question to which it devoted significant attention. The court's statement also accords with what I regard as common sense. The most that can reasonably be *required* of an employer, in accommodating a condition that has no definable "cure" and the ultimate improvement of which can only be projected from present events, is that the employer see the employee through one full cycle of graduated therapeutic and disciplinary measures. It is *always possible* that a person who undergoes inpatient treatment, although aware that termination will follow from failure, will fail and will nevertheless succeed on some later occasion. It is also always possible that an initial success will be followed by a later relapse. The *Braun-Fuller* formulation places a line in the shifting sand that both the employer and the employee can keep in view. The majority's formulation, conversely, is as uncertain as the disease itself. There is invariably "one more" treatment that *can* be tried. But, just as the prospects for plaintiff at COPAC were not recognized until his experience at Springbrook had been

---

[3] I accept as true, for purposes of this opinion, that plaintiff was constructively discharged, because I agree with the majority that that is a fact that the jury could find.

unsuccessful, employers generally can have no more assurance that a second course of inpatient treatment will succeed than a first—especially since a second would not generally be indicated unless the first has failed or has culminated in a relapse after a seeming success.

The majority relies almost exclusively on OAR 839-06-245 (1991) and notes that the court in *Braun* observed that the legislature left the "development of the concept of 'reasonable accommodation' to the Bureau of Labor and Industries in its administrative rules," such as the cited one. *Braun,* 315 Or at 472. The majority faults me for not giving sufficient attention to OAR 839-06-245 (1991). However, the rule was in effect when *Braun* was decided and was specifically discussed in the court's opinion (albeit in an unrelated connection). The court in *Braun* nevertheless made the statements I have quoted concerning reasonable accommodation of alcoholism, and it did so without reference to the rule that, as it demonstrated elsewhere in its opinion, it knew existed. In any event, I see no inconsistency between the Supreme Court's statements and the rule and, presumably, neither did the Supreme Court. The rule is cast in very general terms, and seemingly applies without differentiation to impairments of all kinds; conversely, the court's statements in *Braun* relate specifically to the requirements for reasonable accommodation of the specific and unique form of impairment that was involved in *Braun* and that is involved in this case.

I would hold that defendant had no further duty of reasonable accommodation under ORS 659.425 after plaintiff suffered a relapse in the summer of 1993 and failed to satisfactorily complete his course of inpatient treatment at Springbrook. I therefore respectfully dissent from the reversal of the summary judgment against plaintiff on his statutory claim.

Warren, J., joins in this opinion.